IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN** *a Division of the Rail Conference of the International Brotherhood of Teamsters*,<br>　　　　　　　　　　Plaintiff,<br>　　　　　　v.<br><br>**UNION RAILROAD COMPANY** and **UNITED TRANSPORTATION UNION** ,<br>　　　　　　　　　　Defendants. | CIVIL ACTION NO.   08-986 |

## MEMORANDUM OPINION

CONTI, District Judge.

Pending before the court are three cross-motions for summary judgment that raise issues about whether a January 31, 2008 special board of adjustment 1157 ("SBA 1157") labor arbitration decision rendered pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. § 153, Second should be vacated.  (Joint Exhibit ("J.E.") 0003.)  Plaintiff Brotherhood of Locomotive Engineers and Trainmen ("BLET") seeks this court's review of the labor arbitration decision of SBA 1157 pursuant to the RLA.  45 U.S.C. § 153, First (q); 45 U.S.C. § 153, Second.  BLET asserts that the decision rendered by SBA 1157 did not conform or confine itself to matters within SBA 1157's jurisdiction and should be vacated.  Co-defendants Union Railroad Company ("URR" or "Carrier") and United Transportation Union ("UTU") assert that the decision of SBA 1157 should be affirmed by this court.  For the reasons set forth below, the court will grant BLET's motion for summary judgment and deny URR's and UTU's motions for summary judgment.

**Factual Background**

The employees of co-defendant URR, a company engaged in the transportation of freight by railroad, are represented for purposes of collective bargaining under the RLA, by two labor unions: 1) plaintiff BLET, which represents URR's locomotive engineers; and 2) co-defendant UTU, which represents URR's trainmen.  (Statement of Material Facts in Support of Motion of Petitioner BLET for Summary Judgment ("BLET Stat. Mat. Facts") ¶¶ 1-5.)  BLET and UTU are "representatives" as defined in 45 U.S.C. § 151, Sixth and URR is a "carrier" as defined in 45 U.S.C. § 151, First.  (*Id.* ¶¶ 1-3.)

**1. The Dispute**

In September 2004, a dispute arose among BLET, URR, and UTU with respect to the operation of URR's locomotives by remote control.  (*Id.* ¶ 6.)  URR negotiated an agreement with UTU and assigned the operation of its locomotives by remote control to UTU represented trainmen and not BLET represented locomotive engineers.  (*Id.*)  BLET was not consulted before this decision was made. (J.E. 0022.)  Previously, URR had always assigned engineers represented by BLET to train operations, unless BLET made a prior agreement.  (*Id.*)  In this situation, URR stopped assigning BLET-represented engineers to remote controlled trains after it entered into the agreement with UTU.  (*Id.*)  BLET asserted a claim against URR for violating the BLET-URR collective bargaining agreement (the "BLET CBA"), which, BLET argued, required engine crews operating locomotives to consist of BLET represented engineers. (*Id.*)  URR rejected BLET's claims.  BLET appealed the denials in accordance with the BLET CBA; however, the parties were unable to resolve the differences.  (*Id.*)  The parties agreed to resolve the dispute before a special board of adjustment pursuant to 45 U.S.C. § 153, Second.  (*Id.*)

BLET asserted that article 10 of the BLET CBA ("Article 10") explicitly requires the assignment of a BLET-represented engineer whenever URR operates a locomotive. (J.E. 0023.) BLET argued that Article 10 does not allow for deviation based upon different operations or handling. (J.E. 0024.) Article 10 is a crew-consist rule, which in the railroad industry mandates assignment of employees specified to the jobs listed. (*Id.*) It is established practice in the industry and between the parties that if a crew-consist agreement governs assignment of employees, an assignment may only be changed through agreement with the union. (J.E. 0027.) BLET did not agree to change the collective bargaining agreement. (J.E. 0024.) Prior to the dispute, URR would ask BLET for permission before deviating from the collective bargaining agreement. (J.E. 0027.) BLET asserted that URR's decision not to employ an engineer on every locomotive it operated violated Article 10. (J.E. 0030.)

### 2. The Applicable Collective Bargaining Agreement Provision

The relevant portion of Article 10, entitled "Consist of Crews," provided:

> Engine crews shall consist of engineer and fireman on all engines. It is also understood the same rules will apply if the power is changed from steam to Diesel or other power.

(BLET Stat. Mat. Facts ¶ 4.)

### 3. Arbitration Agreement

URR and BLET submitted the dispute to SBA 1157 under an agreement (the "SBA agreement") entered into pursuant to the provisions of the RLA, 45 U.S.C § 153, Second. (J.E. 0071.) In that agreement, the parties established and limited the jurisdiction of SBA 1157. (J.E. 0071-0075.) The SBA agreement provided in relevant part:

> The Board has jurisdiction only over the dispute described by the parties in their respective Question at Issue. No other claims, issues or disputes may be submitted to the Board except by mutual consent of the parties to this Agreement.

>The Board does not have the authority to create any new rules, add contractual terms or change existing agreements governing rates of pay, rules or working conditions.

(J.E. 0071.)

It also provided:

>The Board will consist of five members: three partisan members, one appointed by each of the parties to this Agreement, a neutral arbitrator who will serve as Chairman of the Board . . . , and a second neutral arbitrator who will serve as the Deadlock Neutral. . . . A party can change their designated member at any time prior to the beginning of the hearing as long as all parties give written consent. The neutral arbitrators selected must have no interest in the issues being decided and no connection with any of the parties.

(J.E. 0071-72.)

>\* \* \*

>BLET, UTU, and the carrier [URR] will be responsible for compensating their partisan member of the Board. The compensation of the Board Chairman and the Deadlock Neutral . . . will be borne equally by BLET, UTU, and the carrier [URR]. The Board Chairman will make all necessary rules for conducting the Boards hearings, consistent with the provisions of this Agreement: *Provided, however,* that the Board Chairman must give the parties to the controversy a full and fair hearing, which must include the opportunity to present evidence in support of their Question at Issue, and an opportunity to present their case in person, by counsel, or by other authorized representatives, as they may respectively elect. . . . Each member of the Board has one vote and may participate in all Board deliberations; any three members of the Board are competent to render an award.

(J.E. 0072-73.)

>\* \* \*

>The Deadlock Neutral must attend all Board hearings and be served will all filings by the parties, but he will not participate in the Board's executive sessions or deliberations. After the record is closed, the Deadlock Neutral will promptly render his written vote on the dispute before the Board in a confidential filing with the Director of Arbitration of the NMB (National Mediation Board). The Deadlock Neutral's vote will not be unsealed unless there is a deadlock, in which event his vote will be determinative as to the dispute.

(J.E. 0073-74.)  The parties defined the parameters of the Board's jurisdiction as follows,

> In its Award, the Board will confine itself strictly to decisions as to the questions specifically submitted to it. The Award of the Board will become effective 30 calendar days after it is rendered and it will be final and binding on the parties with respect to the matters covered, subject to the provisions of the Railway Labor Act.

(J.E. 0074.)

**4. SBA 1157 Decision**

The parties requested SBA 1157 to determine whether URR violated the "Crew-Consist" clause in Article 10 by assigning UTU's trainmen to the remote control operated trains instead of BLET's engineers.  (BLET Stat. of Mat. Facts ¶¶ 10-11.)  Specifically, three questions were submitted to SBA 1157 for arbitration:

> <u>As Framed by BLET</u>
>
> Does BLET Division 700 have a local "crew consist" agreement with the Carrier, and if so, was the Carrier's failure to assign an engineer whenever a locomotive is in operation a violation of Article 10-"Consist of Crews?"
>
> <u>As Framed by UTU</u>
>
> Was the Carrier proper in its assignment of trainmen (yard conductors and yard helpers) to perform remote control operations in its terminals?
>
> <u>As Framed by URR</u>
>
> URR implemented remote control locomotive (RCL) operations in 2004 on yard assignments working within two separate U.S. Steel plants near Pittsburgh, PA. The technology involved in RCL operations eliminates any need for an on-board locomotive engineer on these assignments. Carrier assigned use of remote control technology to ground service employees represented by UTU, pursuant to its agreement with that organization, and established RCL assignments with no engine crew (engineer).  This gave rise to a dispute between Carrier and BLET over whether such actions constituted a violation of Article 10 (Consist of Crews) of the collective bargaining agreement between URR and BLET.
>
> Is URR correct that its actions did not violate Article 10, which states, *"Engine crews shall consist of engineer and fireman on all engines…?"*

(*Id.* at ¶ 12(emphasis in original).)

On April 8, 2008, SBA 1157's board chairman Malin ( the "Board Chairman"), issued Award No. 1, in which he voted in the positive to questions submitted by BLET and UTU. (*Id.* at ¶ 18.) The Board Chairman, however, voted in the negative to the question submitted by URR. (*Id.*) Although the Board Chairman issued his ruling supporting BLET's position, the ruling resulted in a deadlock, as BLET's partisan member agreed with the Board Chairman on all fronts and the partisan members of URR and UTU answered URR's submitted question in the affirmative. (*Id.* at ¶ 19.) Pursuant to the SBA agreement, it became necessary to unseal the determinative vote of the deadlock neutral (the "Deadlock Neutral"). (*Id.* at ¶ 20.) The Deadlock Neutral described his decision by explaining:

> The instant dispute basically is a request for proper interpretation of Article 10 - Consist of Crews in the current agreement between BLET and URR.
>
> It should be here noted that Article 10 was not revised when the "firemen" eventually disappeared through the attrition procedure. When there were no longer any Firemen, there was no attempt to revise Article 10. Instead the BLET now attempts to consider this Article as a mandate to require an Engineer on all engines.
>
> In the course of researching this dispute, in an effort to fully understand the BLET position here involved, this Board has reviewed the dictionary meaning of the word "crew" and has found such word to mean "a group of workers" and/or "a group of people working together." A "crew" then, even in railroad parlance, cannot mean just one individual; consequently, the BLET argument before this Board that Article 10, which is entitled "Consist of Crews," requires an "Engineer" on all engines, cannot be upheld; that is, an "engineer" is not a "crew."
>
> Based on the record before us it is the finding of this Deadlock Neutral that there is not sufficient merit to the BLET argument to justify a decision that Carrier violated Article 10 when it failed to assign an Engineer to a remote controlled engine. The question posed by the BLET must be answered in the negative.
>
> The questions posed by the Union Railroad and the United Transportation Union must be answered in the affirmative.

(J.E. 0003.)

### 5. BLET and URR Correspondence Regarding "One-Man" Crews

BLET argues that the Deadlock Neutral's decision was unsupported by the evidence and thus, went beyond the scope of the issues presented by the parties. BLET argues that URR agreed that an engine crew must consist of an engineer and that a crew can consist of one person. The dispute between the parties involved whether URR was required to place an engine crew (consisting of an engineer) on a remote control locomotive. In support of its position, BLET cited to certain documents that were part of the record before SBA 1157.

The first document cited was a January 9, 2004 letter from URR to the BLET Division 700 general chairman outlining URR's position and rejecting the union's position. (J.E. 0033.) URR's senior director of labor relations wrote:

> "[A]s well confirmed by Referees Vernon's award involving similarly worded rules, Article 10 requires only that if and when the carrier chooses to assign an 'engine crew' on an engine, that crew shall consist of an engineer. Once URR establishes remote control assignments, 'engine crews' will not be necessary. . . Article 10, requiring the use of an engineer applies ONLY when the carrier chooses to assign an 'engine crew' - *an employee* on board operating the locomotive in the conventional manner. Article 10 specifically does not apply unless the locomotive is being operated in the conventional manual manner.

(*Id.* 0033-34.)

In a September 7, 2005 letter written by URR's manager of labor relations - to BLET's acting general chairman, URR's manager noted that UTU had agreed to "a restricted conductor-only crew," but that BLET rejected the Carrier's offer of "an engineer-only Coal Dock crew." (J.E. 0039.) This point was reiterated in UTU's April 5, 2007 letter to BLET's general chairman, in which UTU stated: "[T]he rule is obviously premised upon the need for a 'crew' to operate a locomotive manually or conventionally; if an engine crew is needed, it will consist of

an engineer." (*Id.* 0054.) URR's Reply Submission to SBA 1157 stated that Article 10 "provides that an engine crew will consist of a locomotive engineer." (*Id.* 0487)

The record includes the Elgin, Joliet & Eastern Railway Yardmen's Agreement ( the "EJ&E Agreement"), which specifically recognizes one-man crews. (J.E. 0097.) The crew-consist provision of the EJ&E Agreement provided that "each engine used in general yard service will have a crew to consist of not less than a foreman and one helper." (*Id.*) When the yard helper position on all hot metal and hot cinder crews was eliminated through attrition, the agreement was revised to provide: "Each engine used in hot metal or hot cinder service will have a crew to consist of a foreman only." (*Id.*)

### Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all reasonable inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated only if there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In determining whether a dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 249.

### Discussion

The RLA was established to "provide a framework for peaceful settlement of labor disputes between carriers and their employees." *Union Pacific R.R. v. Price,* 360 U.S. 601, 609

(1959). As part of the RLA, the National Railroad Adjustment Board ("NRAB") was created as a tribunal "to secure the prompt, orderly and final settlement of grievances that arise daily between employees and carriers regarding rates of pay, rules and working conditions." *Union Pacific R.R. v. Sheehan,* 439 U.S. 89, 94 (1978). Through the RLA, Congress intended to keep "minor" disputes out of the courts and within the exclusive jurisdiction of the NRAB. Id.

Section 153, Second of the RLA permits establishment of special boards of adjustment ("SBAs") by agreement of the parties to resolve disputes otherwise referable to the NRAB. *United Steelworkers of America Local 1913 v. Union R.R.,* 648 F.2d 905, 910 (3d Cir.1981). The jurisdiction of a SBA is defined by the agreement between the parties establishing it. 45 U.S.C. § 153, Second ("The cases which may be considered by such board shall be defined in the agreement establishing it."). SBA awards are final and binding upon both parties to the dispute. 45 U.S.C. § 153, Second. SBA decisions are enforceable "by proceedings in the United States district courts in the same manner and subject to the same provisions that apply to proceedings for enforcement of compliance with the awards of the [National Railroad] Adjustment Board." Id. Pursuant to the RLA, a district court has the "jurisdiction to affirm the order . . . or to set it aside, in whole or in part, or it may remand the proceedings . . . for such further action as it may direct." 45 U.S.C.A. § 153, First (q). The scope of judicial review of an Adjustment Board decision is "among the narrowest known to the law." *United Steelworkers of America Local 1913*, 648 F.2d at 910. A SBA award may only be set aside for three reasons: 1) if the board does not comply with the RLA; 2) if a board member acts fraudulently or corruptly; or, 3) if the award fails to conform or confine itself to matters within the scope of the board's jurisdiction. 45 U.S.C. § 153, First (q). Here, plaintiff asserted that the Deadlock Neutral's

decision failed to conform or confine itself to matters within the scope of SBA 1157's jurisdiction.

When a dispute is brought before the NRAB, the board has exclusive jurisdiction to decide all "disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions," and the board's jurisdiction is only limited by the collective bargaining agreement between the parties. 45 U.S.C. § 153, First (i). When the parties choose to bring their dispute before a SBA pursuant to 45 U.S.C. § 153, Second, however, the board's jurisdiction is limited by the arbitration agreement between the parties which established the SBA.  45 U.S.C. § 153.

In this case, the parties significantly limited the jurisdiction of SBA 1157.  In the SBA agreement the parties agreed:

> The Board has jurisdiction only over the dispute described by the parties in their respective Question at issue.  No other claims, issues or disputes may be submitted to the Board except by mutual consent of the parties to this Agreement. The Board does not have the authority to create any new rules, add contractual terms or change existing agreements governing rates of pay, rules or working conditions.

(J.E. 0071.)  The parties defined the jurisdiction of SBA 1157 by agreeing that "[i]n its Award, the Board will confine itself strictly to decisions as to the questions specifically submitted to it." (J.E. 0074.)

Although stated slightly differently, the parties were in general agreement about the issue being submitted to the Deadlock Neutral, and their submissions were specific enough to define clearly the jurisdiction of SBA 1157.  BLET submitted the question: "Was the Carrier's failure to assign an engineer whenever a locomotive is in operation a violation of Article 10-'Consist of

Crews?'"  (BLET Stat. of Mat. Facts ¶¶ 10-11.)  UTU submitted the question: "Was the Carrier proper in its assignment of trainmen (yard conductors and yard helpers) to perform remote control operations in its terminals?" (*Id.*)  URR submitted the question: "Is URR correct that its actions did not violate Article 10, which states, *'Engine crews shall consist of engineer and fireman on all engines…?'* " (*Id.* (emphasis in original))  Essentially, the Deadlock Neutral was charged with determining whether Article 10 was violated when URR assigned trainmen and not engineers to perform the remote control operations.  In order to resolve the question raised, the Deadlock Neutral needed to resolve whether an engine crew is necessary on every remote controlled engine.

      The Deadlock Neutral did not answer the questions presented.  The Deadlock Neutral answered a separate question - whether one engineer could be considered a crew under the terms of the BLET CBA.  The Deadlock Neutral opined that in order to interpret Article 10, he needed to interpret the word "crew."  He, however, was not asked to interpret that word, because the parties acknowledged there could be a one-worker crew.  There was no debate between the parties about what the definition of "crew" meant in railroad terms; the record reflects that the parties agreed that sometimes a crew may consist of one engineer.  (J.E. 0033.)  The parties wanted to know if a crew, which could be composed of one engineer, was required on every remote controlled engine.  Interpreting the word "crew" in the BLET Agreement in a manner inconsistent with the parties' interpretation was outside the scope of the questions submitted and was beyond the Deadlock Neutral's authority.  It does not matter whether the Deadlock Neutral's

interpretation of the word "crew" was right or wrong; there was no dispute concerning the parties' interpretation and it was outside the scope of SBA 1157's jurisdiction.[1]

The Deadlock Neutral did not answer the questions at issue, and under those circumstances the parties can not be bound by the arbitration decision. *See United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597(1960) ("[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice."). The Deadlock Neutral exceeded his jurisdiction when he ignored the record and answered a question not presented. The Deadlock Neutral disregarded the parties' acknowledgment that one-man crews were contemplated by the BLET CBA and concluded that since a crew must consist of more than one worker, an engineer does not constitute a crew. By reaching the conclusion that there can not be a one-worker crew, the Deadlock Neutral rewrote the terms of the collective bargaining agreement. *See Brentwood Medical Assoc. v. United Mine Workers of America*, 396 F.3d 237, 246-47 (3d Cir. 2005) (noting that when an arbitrator rewrites a collective bargaining agreement by disregarding the actual words, deference becomes a rubber stamp).

The decision of the Deadlock Neutral did not conform or confine itself to matters within the scope of SBA 1157's jurisdiction, due to his failure to respond to the questions at issue. The Deadlock Neutral rather than answering the questions that were submitted by the parties,

---

[1] Ignoring the record is contrary to applicable standards for arbitral review. *Transp.-Commc'n Employees Union v. Union Pacific R.R. Co.*, 385 U.S. 157 (1966). The Supreme Court has explained that the decision of a 45 U.S.C. § 153 arbitral board must be based upon the relevant agreement terms and "consideration of 'evidence as to usage, practice and custom' pertinent to all [the] agreements." *Id.* at 165-66 (quoting *Order of Ry. Conductors v. Pitney*, 326 U.S. 561, 567 (1946)). The Deadlock Neutral did not consider the parties' intent and ignored the evidence of record supporting a one-person crew.

answered a question that was not before him, i.e. whether there can be a one-worker crew under the BLET CBA.  How the Deadlock Neutral interpreted the contract does not matter; what matters is that he went outside the scope of his jurisdiction.  The arbitration decision needs to be vacated and the case remanded for proceedings consistent with this opinion.  The motions for summary judgment filed by URR and UTU will be denied and BLET's motion for summary judgment will be granted.

**D. Conclusion**

For the reasons set forth above, the motions for summary judgment filed by URR and UTU are denied and the motion for summary judgment filed by BLET is granted.  This case is remanded for proceedings consistent with this opinion.


By the court:


/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge


Dated: August 28, 2009

cc:     Counsel of record